**FOUR SEASONS LAKESITES, INC.
and Four Seasons Group, Inc.,
Appellants,**

v.

**HRS PROPERTIES, INC., Respondent.**

No. SD 30110.

Missouri Court of Appeals,
Southern District,
Division One.

July 23, 2010.

Lewis Z. Bridges & John E. Curran, Osage Beach, for Appellant.

James B. Deutsch, Thomas W. Rynard & Marc H. Ellinger, Blitz, Bardgett & Deutsch, LLC, Jefferson City, for Respondent.

ROBERT S. BARNEY, Judge.

Appellants Four Seasons Lakesites, Inc. and Four Seasons Group, Inc. ("Four Seasons")[1] appeal the trial court's grant of partial summary judgment in favor of Respondent HRS Properties, Inc. ("HRS") as to Count I of HRS' counterclaim seeking specific performance of an "Option to Sell" contained in an "Option Agreement." Four Seasons asserts thirteen points relied on.

The record reveals that on December 28, 1995, Four Seasons and HRS entered into an "Asset Purchase Agreement" whereby HRS agreed to pay to Four Seasons $2,030,000.00 for its "Racquet Club Business" which consisted of real estate; a spa; and personal property including facilities for indoor and outdoor tennis, racquetball, swimming, and other fitness related endeavors. During the negotiations for the sale of the property, HRS was concerned with several amenities agreements Four Seasons had signed with various third parties relating to the facilities and services available at the Racquet Club and the Racquet Club's continued operation per those agreements.[2] HRS felt that the Racquet Club "was encumbered with the continuing obligation that [it] ... always be available to other ... [p]roperty [o]wners in neighboring subdivisions" regardless of the profitability of the facility and that "it was further encumbered by the obligation not to terminate an amenity located thereon without substituting an amenity of comparable value."

As a compromise, the parties entered into the Option Agreement which granted HRS an Option to Sell the property and facilities back to Four Seasons on the occurrence of what was termed the "Option

1. Four Seasons Group is the parent company of Four Seasons Lakesites; however, we shall refer to them in this opinion as a single entity.

2. The Racquet Club was apparently surrounded by a condominium project as well as several residential developments. Many of the residents of these communities were members of the Racquet Club and had entered into different agreements with Four Seasons about their club membership and Four Seasons' continued responsibility to maintain the club amenities. In 1988 ("the 1988 Amenities Agreement"), Four Seasons agreed with the Country Club Property Owners Association ("the CCPOA") to maintain certain facilities and privileges at the Racquet Club to benefit its members. In 1992, Four Seasons, the CCPOA, and the Four Seasons Lakesites Property Owners Association, Inc. ("the FSLPOA") entered into an agreement ("the 1992 Declaration") that provided Four Seasons "covenants and agrees that it will not withdraw any of the Club facilities which have been made available for the use of the Owners without substituting new Club Facilities ... of comparable value." Additionally, in 1994, Cecil Van Tuyl ("Mr. Van Tuyl"), a property developer, and Four Seasons entered into an agreement ("the 1994 Van Tuyl Agreement") to protect the rights of property owners in his development and to require Four Seasons to continue to provide the amenities they desired. There were also "Sports Package Agreements" sold to several different property owners which granted use of the amenities to those individuals who had purchased the packages.

Event"[3] and it likewise granted Four Seasons the "Option to Buy" the property from HRS.[4] Further, the Option Agreement, *inter alia*, provided for the extinguishment of the Option to Sell:

> in the event that the Property is not encumbered by the continuing obligation to make the Property and the Racquet Club's tennis and fitness facilities available for the use of other property owners and is not encumbered by the obligation not to terminate an amenity currently provided by the Racquet Club without substituting an amenity of comparable value, then the grant of the Option to Sell shall be extinguished and of no more force or effect.

The Option Agreement went on to provide that for HRS to exercise its Option to Sell, it was required to notify Four Seasons in writing and such notification would take effect two days after the notice was mailed. As best we discern the record, the purchase price would be either $2,000,000.00 if the Option to Sell was exercised prior to the construction of a hotel or, if HRS exercised the Option to Sell after the hotel was constructed, the purchase price was to be a price agreed upon by HRS and Four Seasons within 60 days of the notice to sell. Additionally, if the parties were unable to agree on a price then the price would be based on the fair market value of the property as determined by "three

qualified independent certified MAI general real property and business appraisers with experience in resort properties ..." following presentations and argument to the appraisers by the parties. In the event that the price determined by the appraisers was "unacceptable" to HRS, then HRS would not "be obligated to sell pursuant to an exercise of the Option to Sell...." If this event were to occur, then the "Option to Sell shall terminate."

Following the sale of the property to HRS, on July 19, 1996, HRS entered into the 1996 Amenities Agreement with the CCPOA a/k/a the Racquet Club Association; the FSLPOA; Four Seasons; Chase Resorts; and the Robert Trent Golf Course. The 1996 Amenities Agreement provided that in the event that HRS discontinued certain Racquet Club amenities or ceased to operate the Racquet Club altogether, then it would transfer six outdoor tennis courts to the Racquet Club Association. Further, it provided for the cancellation of the 1988 Amenities Agreement and the 1992 Declaration such that "HRS shall be entitled to use the Racquet Club Property free and clear of the terms and provisions of the 1988 [Amenities] Agreement and the 1992 Declaration and without restriction or encumbrance of any kind pursuant to this Agreement except as specifically provided herein."[5] Additional-

3. The Option to Sell provided:

[a]s additional consideration for closing pursuant to the Purchase Agreement, [Four Seasons] hereby grants HRS the right and option (but no obligation) upon the occurrence of the Option Event to sell the real property ... with all improvements and fixtures thereon, ... to [Four Seasons] upon terms and conditions set forth herein.... For purposes of this Agreement 'Option Event' shall mean the occurrence of HRS or its permitted assignee having paid a total of Three Million Dollars ... or Three Million Five Hundred Thousand Dollars ...

in the event that a hotel opens for business on the Property....

4. The only portion of the Option Agreement at issue in this appeal is the Option to Sell granted to HRS; the Option to Buy is essentially not challenged.

5. While the 1996 Amenities Agreement did not reference the 1994 Van Tuyl Agreement, on December 28, 1996, HRS and Mr. Van Tuyl entered into an "Amended and Restated Agreement for Amenities" which incorporated by reference the 1996 Amenities Agreement

ly, an "Election to Terminate Agreement and Election to Terminate Declaration of Restrictive Covenant (Amenities) . . ." was entered into by Four Seasons and the CCPOA. This document also specifically revoked the 1988 Amenities Agreement and the 1992 Declaration as between those parties.

On February 14, 1997, Four Seasons advised HRS that it believed the Option to Sell was extinguished by the 1996 Amenities Agreement which removed any prior encumbrances on the properties arising from earlier amenities agreements. HRS disagreed with this assertion.

HRS presented evidence that it invested $6,943,823.30 for construction of a hotel on the property and also continued to operate the Racquet Club. As best we discern, from 1997 to 2003, both of these facilities operated at a substantial deficit such that on April 12, 2002, HRS and Four Seasons entered into a "Continuation Agreement" which extended the date for exercising the Option Agreement to May 31, 2004. Prior to the expiration of this time period, HRS notified Four Seasons on March 8, 2004, that it desired to exercise its Option to Sell. Negotiations began between the parties at that time and they were ultimately unable to resolve their differences in interpreting the various contracts and agreements in a timely matter such that a "Second Continuation Agreement" was executed. Negotiations continued thereafter and ultimately failed.

On August 15, 2006, Four Seasons filed its "First Amended Petition for Declaratory Judgment" in which it sought a declaratory judgment from the trial court to "adjudicate the rights of the parties pursuant to the Option Agreement in light of the 1996 Amenities Agreement. . . ." Specifi-

cally, Four Seasons requested the trial court to declare one of the following: that "[t]he Option Agreement . . . is extinguished, null, void and of no effect between the parties . . .;" that "[t]he Option Agreement between the parties be declared extinguished, null and void upon the substitution of amenities found by the [trial c]ourt to be required to be provided to other property owners . . .;" that "the Option Agreement . . . be declared null, void and unenforceable as being inequitable as between the parties . . .;" and for "such other and further orders [the trial court deems] appropriate. . . ."

HRS then filed its "Answer and Counterclaim" on August 31, 2006, in which it asserted its affirmative defenses that Four Seasons had "failed to join indispensable parties"[6] and failed "to state a claim upon which relief may be granted." It then asserted a two-count counterclaim. In Count I, HRS sought specific performance of the Option to Sell and maintained that the Option to Sell was not extinguished by the 1996 Amenities Agreement because "[a]t all times . . . the property was and remains encumbered by the continuing obligation to make the property and [the] Racquet Club's . . . facilities available for the use of the other property owners. . . ." In Count II, HRS alleged fraudulent misrepresentation on the part of Four Seasons related to the title insurance commitment provided by Four Seasons during the property transaction.

On March 12, 2008, HRS filed a "Motion for Partial Summary Judgment" on Count I of its counterclaim for specific performance. In this motion it asserted that it had constructed a hotel on the property at issue, it had been operating at a loss since it purchased the property, it had given

---

and stated it was to be considered a supplemental indenture to that agreement.

**6.** No specific parties were named in the motion as being indispensable parties.

Four Seasons notice that it intended to exercise its Option to Sell, and it stood ready to go forward with the valuation process in relation to the Option to Sell. Thereafter, Four Seasons filed a motion to dismiss Count I of HRS' counterclaim.

However, while this lawsuit was pending, on February 15, 2008, HRS and Global Investors, L.L.C. ("Global Investors") entered into a "Purchase and Sale Agreement" where HRS as "Seller" agreed to sell the property at issue, including the Racquet Club and other personal property, to Global Investors.[7] In conjunction with this conveyance, HRS, Global Investors, and First National Bank of Camdenton [8] ("Bank") entered into an "Indemnity Agreement" because of Global Investors' "reluctance" to purchase the property without further assurances. The "Agreement" portion of the Indemnity Agreement also contained a recital, *inter alia,* that "[u]pon the closing of the sale of the Property by HRS . . . HRS . . . shall indemnify and hold Global Investors and Bank harmless against any settlement, court order, injunction or specific performance enforcing the Option to Buy and the Option to Sell." Furthermore, it set out that "if the outcome of the Litigation requires the sale of the Property, HRS . . . shall indemnify and hold Global Investors and Bank harmless against any loss resulting from such outcome." [9] It also set out that the "Option to Sell is not part of the Purchase Agreement, is not intended to [be] conveyed to Global Investors as part of the Purchase Agreement and this Agreement and its indemnities do not apply to any attempt by Global Investors to exercise

the Option to Sell." Likewise, the Indemnity Agreement set out that "[i]n return for the consideration above, Global Investors agrees to purchase the Property subject to the litigation and Option Agreement . . . [and] agrees to reasonably cooperate with the HRS Properties in the litigation . . ." as well as agrees that HRS "shall control the [l]itigation in its sole discretion. . . ."

Additionally, in apparent contradiction to the foregoing instruments, on this same date of April 18, 2008, HRS and Global Investors also executed an "Assignment and Assumption Agreement." It recited that HRS was assigning to Global Investors "all its interest[ ] in certain documents and agreements . . ." which were set out in an attached exhibit. The attached exhibit then referred to numerous documents and agreements including the Option Agreement. In the "Agreement" portion of the Assignment and Assumption Agreement, there is a recital that HRS "hereby transfers, assigns and conveys to [Global Investors], and its successors and assigns, all of [HRS'] right, title and interest in, to and under the Assigned Agreements." Furthermore, Global Investors agreed to accept the assignment of HRS' interest in the "Assigned Agreements" and assumed all the obligations and liabilities of HRS under those agreements. Paragraph 6 of this portion of the Assignment and Assumption Agreement also set out the following language:

*[e]xcept as may be otherwise provided for in the Purchase Agreement* [Global Investors] shall and does hereby agree to indemnify and hold harmless [HRS]

7. An "Amendment to Purchase and Sale Agreement" was also entered into by the same parties on April 18, 2008.

8. As best we discern First National Bank of Camdenton lent Global Investors $2,800,000.00 for the project.

9. There was also a provision in the Indemnity Agreement that if HRS were to prevail in the litigation or recover monies in a settlement then HRS agreed to give Global Investors twenty-five percent of the net proceeds it received.

from any and all liability, loss or damage, which [HRS] may or might occur by reason of [Global Investor's] breach of any obligation or duty arising from the Assigned Agreements on or after the date ... of closing.

(Emphasis added).

On July 18, 2008, the trial court issued its "Order and Judgment." The trial court ruled in favor of HRS on its motion for partial summary judgment relating to Count I of its counterclaim and against Four Seasons on its motion to dismiss Count I of HRS' counterclaim. Four Seasons then timely filed its notice of appeal; however, its appeal was dismissed by this Court on November 5, 2008, due to the lack of a final judgment. A judgment was then entered by the trial court on December 15, 2008. That judgment was again timely appealed to this Court and was again dismissed for lack of a final judgment.

The trial court then issued a third order and judgment in this matter on August 31, 2009. It is this judgment which is the subject of this appeal. In granting HRS' motion for partial summary judgment as to its Count I for specific performance, the trial court decreed that "the Option Agreement is valid and enforceable and has not terminated by operation of the terms of the Option Agreement, by any conduct of HRS ... *or by the sale of the Racquet Club to a third party in April of 2008;*" that Four Seasons "is in breach of its obligations under the Option Agreement;" that the Option Agreement was to be

specifically performed and carried into execution as it pertains to the exercise of the Option to Sell by HRS ... and [that HRS is entitled] to interest from March 10, 2004[, the effective date of its notice to exercise the Option to Sell,] under paragraph 7 of the Option Agreement, which provides that [Four Sea-

sons] pay to HRS a sum equal to the interest accruing at 1 [percent] over the Prime Rate ... per annum, but no event more than 11 [percent] per annum;"

and that HRS is entitled to its attorney fees and costs per the Option Agreement in the amount of $192,559.94 plus interest. (Emphasis added). The trial court also dismissed Count II of HRS' counterclaim as moot and denied Four Seasons' request to dismiss HRS' Count I. This appeal followed.

Four Seasons asserts thirteen points relied on. For ease of analysis, we shall first address Four Seasons' fourth point relied on as we find it dispositive of the bulk of the issues raised in this appeal.

In its fourth point relied on, Four Seasons maintains the trial court erred in overruling its motion to dismiss Count I of HRS' counterclaim, erred in granting HRS' motion for partial summary judgment, and erred in ordering specific performance of the Option to Sell. Specifically, Four Seasons asserts the trial court was in error in making the aforementioned rulings because HRS was no longer the real party in interest in that it had "assigned all of its right, title and interest in and to the Option Agreement and sold the property to [Global Investors] and had retained no reversionary interest in the property and no means to compel a conveyance of the property."

We initially note that a summary judgment can only be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Hitchcock v. New Prime, Inc.,* 202 S.W.3d 697, 699 (Mo.App.2006); *Simul Vision Cable Sys. P'ship v. Cont. Cablevision of St. Louis Cty., Inc.,* 983 S.W.2d 600, 602–03 (Mo.App.1999); Rule

74.04(c)(6).[10] Appellate review is *de novo*. *Wilson v. Rhodes*, 258 S.W.3d 873, 875 (Mo.App.2008). This Court uses the same criteria the trial court should have used in initially deciding whether to grant the motion filed by HRS. *Harris v. Smith*, 250 S.W.3d 804, 806 (Mo.App.2008). Appellate review is based upon the record submitted to the trial court. *Sexton v. Omaha Prop. and Cas. Ins. Co.*, 231 S.W.3d 844, 845 (Mo.App.2007). That record is viewed in the light most favorable to the party against whom judgment was entered, and the nonmoving party is accorded the benefit of all inferences which may reasonably be drawn from the record. *ITT Comm'l Finance Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993).

The crux of the present matter centers on the interpretation of various contracts. "The interpretation of a contract is a question of law." *Dean Machinery Co. v. Union Bank*, 106 S.W.3d 510, 520 (Mo.App.2003). "The cardinal principle of contract interpretation is to ascertain the intention of the parties and to give effect to that intent." *Dunn Indus. Group, Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 428 (Mo. banc 2003). To determine the intent of the parties, the terms of a contract are read as a whole and given their plain, ordinary, and usual meaning. *State ex rel. Vincent v. Schneider*, 194 S.W.3d 853, 859 (Mo. banc 2006).

"Specific performance [of a contract] is a purely equitable remedy, governed by equitable principles, invoked where necessary ..." to do complete justice between the parties. *Asbury v. Crawford Elec. Co-op., Inc.*, 51 S.W.3d 152, 158 (Mo.App.2001). Further, "as with any action for specific performance, 'the right to sue is triggered by the failure of a party to do that which is contracted for, in accordance with the procedure established by the contract.'" *Stiff v. Stiff*, 989 S.W.2d 623, 628 (Mo.App.1999) (quoting *Carondelet Health Sys. v. Royal Gardens*, 943 S.W.2d 669, 672 (Mo.App.1997)). "A party seeking specific performance must have tendered everything that was due on his part, unless the tender was excused or waived by the seller's conduct." *Wintermute v. Delgado*, 919 S.W.2d 248, 250 (Mo. App.1996).

Here, during the time period that Four Seasons and HRS were at an impasse regarding the Option to Sell, HRS sold the properties at issue to Global Investors. As previously recited, there were numerous documents comprising this transaction between Global Investors and HRS including the Purchase and Sale Agreement; the Amendment to Purchase and Sale Agreement; at least four warranty deeds relating to the subject real properties; the Indemnity Agreement; and the Assignment and Assumption Agreement. Looking at the plain meaning of all these documents, it is clear that during the course of this litigation HRS conveyed away its interests in the real properties at issue as well as its interest in the Option Agreement.

In our reading of these documents, there is essentially nothing which mandates that Global Investors re-convey the properties at issue to either HMS or Four Seasons; nor is there a right given to HRS to repurchase the properties in question from Global Investors. In the event that Global Investors should choose not to re-convey the properties, additional litigation would be necessary to carry out any terms of the Option Agreement as HRS is no longer the title holder to these properties and Global Investors was not a party to

**10.** All rule references are to Missouri Court Rules (2009).

this litigation. Contrary to the assertions of HRS, there is no probative showing of a requirement that "Global Investors is obligated to transfer the property to Four Seasons if the Option to Sell is fully exercised."

Furthermore, it is our view that the Indemnity Agreement relates solely to monetary remuneration by HRS to Global Investors in relation to the lawsuit at issue. There appears to be nothing in this document concerning transferring title to the property from Global Investors back to HRS if necessary; indeed, under the terms of the Indemnity Agreement, it was expressly understood that "the Option to Sell is not part of the Purchase Agreement, [and it] is not intended to [be] conveyed to Global Investors...."

■■■ On the other hand, while HRS had specifically *assigned all its interest in the Option Agreement* to Global Investors in paragraph 6 of the Assignment and Assumption Agreement, HRS and Global Investors expressly excepted out of the agreement what was "otherwise provided for in the Purchase Agreement ...," i.e., the conveyance of the real properties in question. Accordingly, in the midst of its litigation with Four Seasons, HRS conveyed away its interest in the involved real estate to Global Investors, a non-party to this litigation, and, as best we discern, Global Investors now has fee simple title to the real estate in question.

'The specific performance of a contract for the purchase of real estate may be decreed only where it is possible for the defendant to convey the land. If he has no title, or has parted with the title after the execution of the contract, the court will not grant a vain judgment.'

*Tinnon v. Tanksley,* 408 S.W.2d 98, 102 (Mo. banc 1966) (quoting *Saperstein v. Mechanics' & Farmers' Savings Bank of Albany,* 228 N.Y. 257, 260, 126 N.E. 708 (N.Y.1920)). Additionally, "specific performance cannot be decreed of a defendant who does not have title to the property to be conveyed or the means of compelling a conveyance of title, i.e., where performance is impossible, the remedy will be denied." *Gulf Oil Corp. v. Ferguson,* 509 S.W.2d 1, 6 (Mo. banc 1974). Indeed, "an equity court should not grant a decree purporting to affect rights of persons not parties to the suit." *Id.;* see *H.B. Deal & Co. v. Kuhlmann,* 244 S.W.2d 390, 394 (Mo.App. 1951). "It is impossible for an equity court to make a decree in the absence of an indispensable party, that is, in the absence of a party whose rights must necessarily be affected by such decree." *Kuhlmann,* 244 S.W.2d at 394 (quoting *Seeley v. Cornell,* 6 F.Supp. 241, 243 (TX 1934)). Here, Global Investors became a real party in interest in this lawsuit when the properties in question were conveyed to it.[11] Accordingly, the judgment "is not effective because it leaves the performance of the mandate to the wish or will of persons not parties to the suit." *Id.;* see *also* Rule 52.01.

■■■ In that HRS sold to Global Investors the real and personal properties

11. Rule 52.01 provides that "[e]very civil action shall be prosecuted in the name of the real party in interest...." "Real parties in interest are those who are directly interested in a lawsuit's subject matter. The purpose of the Rule is to enable those who are interested in the subject matter of the action and entitled to the benefits of the litigation to be those who maintain the action." *Herky, LLC. v. Holman,* 277 S.W.3d 702, 704 (Mo.App.2008) (internal citations omitted). "'In order to determine the real party in interest in this case, we look to the facts as they appear on the record.'" *Id.* (quoting *Carolan v. Nelson,* 226 S.W.3d 923, 926 (Mo.App.2007)). "The party with the bare legal title to a claim is the real party in interest." *Prot. Sprinkler Co. v. Lou Charno Studio, Inc.,* 888 S.W.2d 422, 424 (Mo.App.1994); see *Klein v. Gen. Electric Co.,* 714 S.W.2d 896, 902 (Mo.App.1986).

which were the subject of the Option Agreement, HRS lacks the legal ability to convey the properties to Four Seasons under the terms of the Option Agreement and there is nothing upon which to base the trial court's grant of summary judgment, because the Option Agreement cannot be specifically performed by HRS. Thus, Count I of HRS' counterclaim is rendered moot because there is no effectual relief which can be granted by the trial court. " 'When an event occurs that makes a court's decision unnecessary or makes it impossible for the court to grant effectual relief, the case is moot and generally should be dismissed.' " *Jackson Cty. Bd. of Election Comm'rs ex rel. Brown v. City of Lee's Summit*, 277 S.W.3d 740, 744 (Mo.App.2008) (quoting *State ex rel. Ag Processing, Inc. v. Public Serv. Comm'n*, 276 S.W.3d 303, 306 (Mo.App.2008)). " 'The doctrine is triggered when some event so alters the position of the parties that any judgment rendered merely becomes a hypothetical opinion.' " *Id.* (quoting *Thruston v. Jefferson City Sch. Dist.*, 95 S.W.3d 131, 134 (Mo.App.2003)). The trial court erred in denying Four Seasons' motion to dismiss HRS' first counterclaim and in granting HRS' motion for partial summary judgment as to its first counterclaim for specific performance. Point IV is granted.

Point IV is dispositive of Four Seasons' Points I, II, III, V, VI, VII, VIII, and X. Those points are hereby denied. Additionally, also denied, in part, is that portion of Point IX, discussed more fully below, which also attacks the trial court's grant of partial summary judgment. Further, the trial court's ruling that Count II of HRS' counterclaim was moot was based on the trial court's determination that Count I warranted a grant of partial summary

judgment. However, because this Court has determined the trial court erred in granting partial summary judgment as to Count I, the trial court's ruling as to Count II also cannot stand and it remains a viable counterclaim.

In our review of the remainder of Four Season's ninth point relied on, Four Seasons asserts the trial court erred in overruling its motion for reassignment of the case to a different judge pursuant to Rule 11.09(c). Four Seasons asserts that "the trial judge was without authority to act and abused his discretion ..." in overruling its motions in that the "trial judge failed to file mandatory disclosures pursuant to Rule 11.09 and refused to reassign the case upon timely motion."

 "In reviewing the trial court's denial of a motion for change of judge, the appellate court presumes that a trial judge will not preside over a proceeding in which the judge cannot be impartial." *Williams v. Reed*, 6 S.W.3d 916, 920 (Mo.App.1999). "A judge's impartiality might reasonably be questioned if a reasonable person would have a factual basis to doubt the judge's impartiality." *McPherson v. U.S. Physicians Mut. Risk Retention Group*, 99 S.W.3d 462, 488 (Mo.App.2003). "Therefore, this [C]ourt will affirm the trial court's denial of a motion for change of judge unless the denial constitutes an abuse of discretion." *Williams*, 6 S.W.3d at 920.

 Here, Four Seasons argues that the trial court erred in denying its "Request for Reassignment ..." of Senior Judge Theodore B. Scott ("Judge Scott") because Judge Scott failed to abide by Rule 11.09(c).[12] Four Seasons argues that "the record does not indicate ..." if Judge Scott filed such a list, thus, he should have been disqualified from hearing the present matter. It appears from the docket sheets

---

**12.** Rule 11.09(c), pertaining to "Senior Judge Limitations," provides that

in this matter that HRS filed a response to this motion in which it challenged Four Seasons' arguments and that a hearing was held on this motion shortly thereafter. Yet, Four Seasons has not provided a copy of the transcript from that hearing to this Court in support of its argument. As the appellant, it was Four Seasons' duty to order any transcripts that would be necessary to support its points relied on. Rule 81.12(c). Absent evidence to the contrary, we presume that "a trial judge will not preside over a proceeding in which the judge cannot be impartial," *Williams,* 6 S.W.3d at 920, and that Judge Scott was in compliance with Rule 11.09(c). Point IX is denied.

In its eleventh point relied on, Four Seasons challenges the trial court's judgment awarding interest to HRS per paragraph 7 of the Option Agreement and in its twelfth point Four Seasons challenges the award of interest to HRS under the Option Agreement because the purchase price had yet to be determined as required by paragraph 7 of the Option Agreement. Based on our determination that partial summary judgment was improperly granted, we find the foregoing points have merit. As previously related, HRS could not make a demand on Four Seasons to purchase the properties in question because it could not convey those properties to Four Seasons. Hence, it was not entitled to an award of interest under the provisions of paragraph 7 of the Option Agreement. Points XI and XII are granted.

As best we discern Four Seasons' thirteenth point relied on, it challenges the award of attorney's fees and costs granted to HRS by the trial court. Four Seasons maintains that at trial HRS did not distinguish between the attorney's fees it had expended in pursuing its claim under Count I for specific performance and those expended in pursuing its claim under Count II for misrepresentation, which the trial court specifically found to be moot. Having already determined that the trial court erred in entering its partial summary judgment in favor of HRS for specific performance, HRS was not entitled to attorney's fees and costs pursuant to paragraph 19 of the Option Agreement. The trial court erred in its award of attorney's fees and costs to HRS. Point XIII has merit.

That part of the Order and Judgment of the trial court granting HRS' Motion for Partial Summary Judgment is reversed, together with any declarations and affirmative relief, including attorney's fees, costs, and interest, arising from the grant of partial summary judgment. Also reversed is the trial court's determination that Count II of the counterclaim of HRS is moot. Count II of the counterclaim of HRS remains viable. In all other respects the Order and Judgment of the trial court is affirmed.

BATES, P.J., and BURRELL, J., concur.

[a] senior judge shall file in each court in which he or she serves a list of the parties, lawyers, and law firms that have retained the senior judge for compensation within the preceding 36 months. The senior judge shall review the list every calendar quarter and file any necessary changes on or before the last day of the quarter. If any counsel of record requests reassignment in writing within ten days of the judge being assigned or before any appearance before the judge, whichever is earlier, the senior judge shall: (1) If assigned as a senior judge in a circuit court, return the file to the presiding judge for reassignment; or (2) If assigned as a senior judge in an appellate court, recuse from the case.