

# In the
# Missouri Court of Appeals
## Western District

| | |
|---|---|
| **JTB PROPERTIES, LLC.,** | |
| **Appellant,** | **WD84001** |
| **v.** | **OPINION FILED:** |
| **JOSEPH ZWILLENBERG, ET AL.,** | **MAY 25, 2021** |
| **Respondents.** | |

### Appeal from the Circuit Court of Jackson County, Missouri
### The Honorable James Dale Youngs, Judge

### Before Division One: Anthony Rex Gabbert, Presiding Judge, Edward R. Ardini, Jr., Judge, Thomas N. Chapman, Judge

JTB Properties, LLC ("JTB" or "Purchaser" or "Buyer") appeals the partial summary judgment and denial of a cross motion for summary judgment in the Jackson County Circuit Court. In three points on appeal, Purchaser argues the trial court misapplied the law and ignored genuine issues of material fact. The judgment is reversed and remanded.

### Facts

In January 2019, JTB entered into a contract to purchase real property from Joseph Zwillenberg and Julie Jackson Zwillenberg ("the Zwillenbergs" or "Sellers"). Among the contract's other provisions was a requirement that Purchaser order a title insurance commitment

to insure that good and marketable title would be passed to Purchaser at closing subject to permitted exceptions. Also part of the contract was a provision that Purchaser notify Sellers of its objections to any exceptions to title contained in the title commitment. This same provision stated that if Purchaser did not timely disapprove of exceptions to title shown in the title commitment, the exceptions would be deemed waived, and treated as permitted exceptions to the title conveyed by Sellers. The contract identified Assured Quality Title Insurance Company of Kansas City, Missouri as the agreed upon title company both for purposes of issuing an owner's title insurance policy to Purchaser and to act as the closing escrow agent. The contract provided that the fee for issuance of the title commitment and for the premium for issuing an owner's title policy were to be paid by the Sellers.

Purchaser obtained and delivered to Sellers a title commitment that identified on Schedule B, part II fifteen exceptions to title. Purchaser did not object to any of these exceptions in the title commitment, and as a result, all fifteen exceptions identified in the title commitment became permitted exceptions to title as provided by the parties' contract.

The contract described a closing procedure which required, among other things, that Sellers "shall deposit [their] duly executed special warranty deed in form and substance approved by Buyer and the Title Company, conveying good and marketable title" to the property described in the contract "warranting title to be free and clear of any liens and encumbrances, except the permitted exceptions . . . ."

On March 21, 2019, Sellers sent Purchaser a letter indicating Sellers were terminating the contract. On April 14, 2019, Purchaser responded in writing that such termination was not permissible under the contract, the contract was still in effect, and closing would occur as scheduled on May 3, 2019.

2

On May 3, 2019, Sellers provided the title company with an unexecuted special warranty deed, along with a closing instructions letter which read:

Dear Jim:

As you are aware, this firm represents the Transferor with respect to the Transferor's sale of the Property set forth and described in the Title Commitment to JTB under that certain Contract for Sale of Real Estate dated January 14, 2019, of which you have copy (the "Contract"). You have agreed to act as closing escrow agent for consummating the transfer of the Property by the Transferor.

The Transferor has delivered or will deliver to you under separate cover the following original documents executed by Transferor:

1. Special Warranty Deed conveying the Property to the Transferee, in the form attached hereto (the "Deed"); and,
2. Form 1099, executed by Transferor; and,
3. Seller's Settlement Statement, executed by Transferor.

The documents described above shall collectively be referred to herein as the "Transferor Documents".

You are hereby instructed to hold each of the delivered Transferor Documents in escrow in accordance with the instructions contained herein. Upon receipt of each of the following, you are authorized to record the Deed:

1. You are in receipt of all of the Transferor Documents and all documents from Transferee that are required by the Contract and you to close the transaction.
2. You have received the Purchase Price and all other amounts due from Transferee that are necessary to remit the balance due to Seller set forth in Seller's Settlement Statement.
3. I have provided you with written authorization, via electronic mail, to close this transaction.

After closing, please provide me with file-stamped copies of all of the recorded Deed, and copies of all signed documents.

In the event that you are unable to comply with these instructions no later than 3:00 p.m. CST on the Closing Date, you are instructed to take no action hereunder and to contact the undersigned immediately for instructions.

The unexecuted special warranty deed that was referenced in and attached to Sellers' closing instructions letter read, in part, as follows:

3

This ____ day of May, 2019, JOSEPH ZWILLENBERG and JULIE JACKSON ZWILLENBERG, husband and wife ("Grantor"), for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration to it paid by JTB Missouri limited liability company ("Grantee"), their heirs and assigns, the receipt and sufficiency of which are acknowledged, has BARGAINED, SOLD, CONVEYED AND CONFIRMED and by these presents does BARGAIN, SELL, CONVEY AND CONFIRM unto the Grantee that certain real estate located in the County of Jackson, State of- Missouri (the "Property"), described as follows:

…

subject, however, to those matters set forth on Exhibit "A" attached hereto and all zoning laws and easements and rights-of-way of record, if any.

Exhibit A identified seven matters as to which title conveyed by the Special Warranty Deed would remain subject:

1. All assessments and taxes for the year 2019 and all subsequent years, none now due and payable.
2. Easement granted to the State of Missouri, acting by and through the State Highway Commission filed June 30,1961 as Document No. B382547, over a portion of the premises in question, as more fully therein.
3. Utility Easements reserved by Kansas City over that part of the premises in question in vacated alley as set forth in Ordinance filed August 26,1965 as Document B526760 in Book B5828atPage53.
4. Easements, if any, for public utilities installed in, under or upon the vacated alley prior to the vacation thereof, and for which no notice appears in the Office of
5. Subject to the interest of the public in and to any portion of the premises in question in streets or
6. Rights of parties in possession under unrecorded leases.
7. Judgments and Tax Liens, if any, against the party to be insured, JTB Properties, LLC.

The seven matters noted on Exhibit A to the unexecuted special warranty deed were items seven through thirteen on Schedule B, part II of the title commitment, and were thus "permitted exceptions" pursuant to the terms of the contract as they were not disapproved by Purchaser. Items one through six, and items fourteen and fifteen, on Schedule B, part II of the title commitment were not listed on Exhibit A of the unexecuted special warranty deed, even though they were permitted exceptions to title as they had not been disapproved by Buyer.

4

Schedule B, part I of the title commitment described the means by which exceptions two through six on Schedule B, part II could be removed as exceptions to title in a later issued title insurance policy, all of which required the provision of a Seller's Affidavit. Item one on Schedule B, part II identified an exception to title for "[a]ny defect, lien, encumbrance, adverse claim, or other matter that appears for the first time in the Public Records or is created, attaches, or is disclosed between the Commitment Date and the date on which all of the Schedule B, Part 1 – Requirements are met," and thus addressed the "gap" period between generation of the title commitment and closing. The title commitment did not describe a means by which this exception could be removed as an exception to title in a later issued title insurance policy. In any event, it is uncontested that Purchaser did not seek the removal of items one through six on Schedule B, part II of the title commitment from the title insurance policy required to be issued by the contract, and paid for by the Sellers.

On the May 3 closing date, the following emails were sent between Sellers and the title company:

> **Sellers' Counsel to Title Company (3:08 PM):** Following up on our conversation of a few moments ago, I understand from you that in the event that you do not receive a Gap Indemnity Agreement (***necessary for you to provide Purchaser's title insurance between the gap between the last title search and the closing date***) and Seller's Affidavit (***necessary for you to issue Purchaser's title insurance policy with the standard exceptions removed, among other things***), you will not be able to close this transaction, regardless of whether Seller's Deed and Settlement Statement are provided.
>
> **Title Company to Sellers' Counsel (3:15 PM):** We must be provided with the signed Seller's Affidavit and the Gap Indemnity to provide the Purchaser with title insurance as set out in the contract. Let me know if you need anything further.
>
> **Sellers' Counsel to the Title Company (3:17 PM):** Thanks Jose. Appreciate the confirmation.

(Italicized emphasis added.) Purchaser was not included in these emails.

On May 6, 2019, the following Monday, Sellers sent Purchaser an email with following letter attached:

Dear Sir or Madam:

Please be advised that we are terminating and cancelling the Contract for Sale of Real Estate dated January 14, 2019, on the above referenced property.

The Contract provided that the closing was to have occurred by May 3, 2019. On May 3, 2019, the title company instructed my counsel that they were unable to close the transaction without me executing additional documents that exposed me to additional risk that was not contemplated by the contract and that I did not agree to undertake. As a result, the contract did not close on May 3, 2019.

Pursuant to Section 7 of the Contract, as a result of your failure to close the Contract on May 3, 2019, I will ask the title company to deliver the Earnest Money to me.

Purchaser filed a petition asserting claims against Sellers for Breach of Contract – Specific Performance (Count I) and Breach of Contract – Damages (Count II). Purchaser and Sellers filed opposing motions for summary judgment. Purchaser argued that by failing to provide an executed warranty deed, Sellers breached the contract. The court found that it was undisputed that Sellers did provide a *form* of deed at closing. The court found as a matter of law, however, that what prevented the closing from taking place was not the failure on the part of Sellers to provide the deed in an executed form, but "the refusal of the title company engaged by [Purchaser] to issue a title insurance policy without first being provided gap indemnity" to remove the exception from title for the "gap" period between the date of the title commitment and the date of closing. The court further found that it was undisputed that Sellers were not obligated by the contract to provide gap indemnity, and Purchaser "chose not to do" so.

The court also found that even an executed deed would not have been in either form or substance acceptable to the title company as was required by the contract. Thus, even if the failure to provide an executed deed was a breach, the breach did not cause Purchaser's damages as alleged

6

in Count II because the title company's demand for gap indemnity is what kept the transaction from closing on May 3rd. The court concluded that Purchaser never provided notice of an intention to extend the closing date for the contract, nor did Purchaser notify Sellers of its intention to terminate the contract itself. Under the terms of the contract, time was of the essence and under the circumstances, the court concluded that Sellers were within their rights to terminate the agreement themselves on May 6, 2019.

The court granted Sellers' motion for summary judgment, and denied Purchaser's cross motion for summary judgment. This appeal follows.[1]

## Standard of Review

The standard of review for appeals from summary judgment is "essentially *de novo*." *State ex rel. Koster v. Olive*, 282 S.W.3d 842, 846 (Mo. banc 2009) (citing *ITT Commercial Fin. Corp. v. Mid. Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993)). This Court reviews "the record in the light most favorable to the party against whom judgment was entered." *Id.* Summary judgment "shall be entered if 'there is no genuine issue as to any material fact and … the moving party is entitled to judgment as a matter of law.'" *Id.* (citing Rule 74.04(c)(6)).[2]

"We will affirm the trial court's granting of summary judgment if it is correct as a matter of law on any grounds." *Behrick v. Konert Farms Homeowners' Assn.*, 601 S.W.3d 567, 573 (Mo. App. E.D. 2020). "Ordinarily, the denial of a motion for summary judgment will not be reviewed on appeal." *Id*. (internal quotation marks omitted). "Where, however, the material facts are

---

[1] Sellers had a pending counterclaim against Purchaser. After the grant of summary judgment, they dismissed the counterclaim rendering the judgment final for appellate purposes. *See Stewart v. Liberty Mut. Fire Ins. Co.*, 349 S.W.3d 381, 384–85 (Mo. App. W.D. 2011).

[2] Sellers argue that this court should adopt an abuse of discretion standard of review. They cite two cases where a court addressed the merits of a claim for specific performance. They do not cite a case involving summary judgment on a claim of specific performance. We decline to use an abuse of discretion standard of review in our review of the grant of summary judgment.

undisputed and the merits of the denied cross-motion for summary judgment are inextricably intertwined with the issues raised in the granted motion for summary judgment, the merits of the denial of the cross-motion may be reviewed on appeal." *Id.* (internal quotation marks omitted).

**Points I and II**

Purchaser's first two points pertain to the grant of summary judgment against it on its request for specific performance. In the first point, Purchaser argues that there is no genuine dispute of material fact and summary judgment should have been granted in its favor. In the second point, Purchaser argues alternatively that summary judgment should not have been granted in Sellers' favor because there is a genuine dispute of material fact and the matter should be remanded for trial. We grant the second point.[3]

"Specific performance [of a contract] is a purely equitable remedy, governed by equitable principles, invoked where necessary ... to do complete justice between the parties." *Four Seasons Lakesites, Inc. v. HRS Properties, Inc.*, 317 S.W.3d 193, 200 (Mo. App. S.D. 2010) (internal quotation marks omitted). "[A]s with any action for specific performance, the right to sue is triggered by the failure of a party to do that which is contracted for, in accordance with the procedure established by the contract." *Id.* (internal quotation marks omitted). "A party seeking specific performance must have tendered everything that was due on his part, unless the tender was excused or waived by the seller's conduct." *Id.* (internal quotation marks omitted).

"Summary judgment is appropriate when a moving party shows there are no genuine issues of material fact and the party is entitled to judgment as a matter of law." *Daniels v. Terranova*, 611 S.W.3d 799, 806 (Mo. App. W.D. 2020) (internal quotation marks omitted). "The movant

---

[3] Because we determine there is still a genuine issue of material fact, it is not necessary to address Purchaser's motion for summary judgment, and we deny Point I.

bears the burden of establishing a legal right to judgment and the absence of any genuine issue as to any material fact required to support the claimed right to judgment." *Id.* (internal quotation marks omitted). A defendant who moves for summary judgment must demonstrate:

> (1) facts negating any one of the claimant's elements necessary for judgment; (2) that the claimant, after an adequate period of discovery, has not been able to—and will not be able to—produce evidence sufficient to allow the trier of fact to find the existence of one of the claimant's elements; or (3) facts necessary to support his properly pleaded affirmative defense.

*Id.* (internal quotation marks omitted). "Regardless of which of these three means is employed by the 'defending party,' each establishes a right to judgment as a matter of law." *Id.* (internal quotation marks omitted). "Once the [movant] has made such a showing, the burden shifts to the [non-moving party], who must demonstrate by affidavit, depositions, answers to interrogatories[,] or admissions on file that one or more of the material facts relied upon by the [moving] party is genuinely disputed." *Id.* (internal quotation marks omitted).

It is undisputed Purchaser performed its duties under the contract, including depositing the full purchase price with the title company. It is also undisputed that Sellers did not provide an executed deed on the day of closing. However, the parties do dispute whether the failure to provide an executed deed was the reason the sale did not close.

Sellers claim that the sale would not have closed even if they had executed the deed because the title company required gap indemnity, something Sellers were not required to provide and did not want to provide. They maintain providing an executed deed would have been a futility. Sellers argue that it was impossible to provide a deed acceptable to the title company because of the lack of gap indemnity. Purchaser argues that the title company did not state the sale would not close without gap indemnity. Instead, it stated it could not provide a title policy "as set out in the contract." Purchaser also argues that it had previously waived the gap indemnity period and that

the title company misread the contract. It maintains that the sale would have closed if Sellers provided an executed deed as required by the contract.

In the motions for summary judgment and suggestions in opposition to summary judgment, Purchaser disputed the following relevant facts:

> The title company, on the closing date, demanded that Defendant Sellers provide gap indemnity for the title insurance policy called for under the Contract.
> **RESPONSE: Admit that the title company sent the email attached to Defendant's Motion for Summary Judgment as Exhibit E. However, that email plainly makes clear that the title company never demanded that Defendant Sellers provide gap indemnity in order to, as Defendants assert, "close the transaction." Further, the Purchaser never represented that it would not close the transaction or perform under the contract without such gap indemnity.**

Sellers disputed the following facts:

> As part of the closing on May 3, 2019, the Contract obligated Sellers to deliver to the Title Company a duly executed special warranty deed, in favor of Purchaser, conveying good and marketable title and "warranting title to be free and clear of any liens and encumbrances, except the permitted exceptions and such other encumbrances as Purchaser shall have agreed to in writing."
> **RESPONSE: Denied in part: Admitted** that the quoted language is accurate. **Denied** in that Plaintiff omits critical language from the cited paragraph. Section 13(A) reads in full as follows: Seller shall deposit its duly executed special warranty deed **in form and substance approved by Buyer and the Title Company**, conveying good and marketable title to the Subject Property to the Buyer and warranting title to be free and clear of any liens and encumbrances, except the permitted exceptions and such other encumbrances as Buyer shall have agreed to in writing. (emphasis added). The deed was not "in form and substance approved by … the Title Company" because there was no "gap insurance" that would have indemnified the title company from any claims based on encumbrances to title that may have occurred after the title company made its initial search.
>
> On or about April 26, 2019, JTB deposited the Purchase Price with the Title Company. At no point before, on, or after the closing date did JTB ever advise, inform, instruct, or in any way represent to the Sellers or the Title Company that JTB would rescind its deposit of the Purchase Price, refuse to accept Seller's Deed, refuse to close the transaction, or otherwise not perform any of its Contract obligations unless the Sellers provided a gap indemnity.

10

**RESPONSE: Admitted** that JTB made no such representations. To be clear, this fact says nothing about whether JTB actually performed its obligations, and therefore this response should not be taken as an admission on that point.

The Contract obligated Sellers to deliver to the Title Company a duly executed special warranty deed, in favor of Purchaser, conveying good and marketable title and "warranting title to be free and clear of any liens and encumbrances, except the permitted exceptions and such other encumbrances as Purchaser shall have agreed to in writing."

**RESPONSE: Denied in part: Admitted** that the quoted language is accurate. **Denied** in that Plaintiff omits critical language from the cited paragraph. Section 13(A) reads in full as follows: Seller shall deposit its duly executed special warranty deed **in form and substance approved by Buyer and the Title Company**, conveying good and marketable title to the Subject Property to the Buyer and warranting title to be free and clear of any liens and encumbrances, except the permitted exceptions and such other encumbrances as Buyer shall have agreed to in writing. (emphasis added). The deed was not "in form and substance approved by … the Title Company" because there was no "gap insurance" that would have indemnified the title company from any claims based on encumbrances to title that may have occurred after the title company made its initial search.

Those seven matters were identified as exceptions in the title commitment that Sellers obtained pursuant to the Contract.

**RESPONSE: Denied in part. Denied** that the Sellers obtained the title commitment, as that was the Buyer's responsibility. **Admitted** that the same seven exceptions appear in the title commitment and the Deed

The Contract provided that those seven matters would be permitted as "exceptions" to the title that Sellers were to convey (via the deed under Paragraph 13(A)) if Purchaser had not timely objected to them (pursuant to Paragraph 9).

**RESPONSE: Denied in part. Admitted** that Paragraph 9 to the Real Estate Contract generally discusses that exceptions not objected to buy the Buyer "shall be deemed waived by Buyer and included in the permitted exceptions." **Denied** in that the contract does not mention "those seven matters" or any particular exceptions. Also **Denied** in that Section 13(A) is recited above, and it has additional conditions, including that the title be "in form and substance approved by … the Title Company"

We find that a genuine question of material fact exists regarding whether the real estate sale would have closed if Seller tendered an executed deed to the title company. The summary judgment record does not include as an uncontroverted fact that the title company would not have closed had it been provided an executed deed. Indeed, Sellers never asserted that in their statement

11

of uncontroverted facts. Nevertheless, as shown above, Purchasers specifically controverted that fact in response to a different paragraph.[4] We further note that Sellers do not allege as an uncontroverted fact that their executed deed would not be approved by the title company. Sellers do not allege that the title company requested the deed itself be changed. Instead, they rely on emails exchanged with the title company, and on which Purchaser was not a recipient, where the title company stated that a title insurance policy would not be provided without additional documents from the Sellers. In sum, the summary judgment record does not establish as a matter of law that Sellers' failure to provide an executed deed was not the reason the sale failed to close and therefore did not constitute a breach of the contract.[5]

Moreover, it is not explained in the summary judgment record why the title company believed it could not issue a title policy without a Sellers' Affidavit or a gap indemnity agreement, a subject that is inherently factual in nature. It is not explained in the summary judgment record why the trial court reasoned Purchaser did not "choose" to provide a gap indemnity agreement when the uncontroverted facts indicate Purchaser was not insisting on a gap indemnity agreement, or on title insurance covering ***any*** of the permitted exceptions. A cursory reading of the contract and of the title commitment could support an inference that the title company was insisting on a Sellers' Affidavit and a gap indemnity agreement because the form of special warranty deed tendered by Sellers did not conform with the requirements of the contract as it did not convey good and marketable title "warranting title to be free and clear of any liens and encumbrances, except

---

[4] The email from the title company simply said it could not provide the title insurance required under the contract. The title company never stated that it could not or would not close the transaction without the gap indemnity.

[5] There are potential scenarios wherein the real estate sale might have closed had Sellers provided an executed deed. Purchaser could have persuaded the title company that it had already waived any liability for the gap period under the contract and for the exceptions to title that could have been removed by a Sellers' Affidavit, and that even though the special warranty deed did not identify every permitted exception, the insurance provided by the title policy was limited in scope by the terms of the title commitment, and thus excluded from coverage every permitted exception.

12

the permitted encumbrances." Since Exhibit A to the unexecuted special warranty deed did not describe all of the permitted exceptions, it effectively sought to convey "good and marketable title" that ignored other permitted exceptions. The title company's insistence on a Seller's affidavit and a gap indemnity agreement may well have been for its own protection, due to the fact Sellers tendered a deed that was not in form the form required by the contract, and that did not align with the exceptions in the title commitment. An inference of this nature, however, is inherently factual in nature. But, if established, it could not be said that Sellers were entitled to judgment as a matter of law, as the title company's insistence on either a contractually conforming deed, or alternatively, affidavits and a gap indemnity agreement to protect the title company's potential exposure caused by a nonconforming deed, would arguably not constitute a default by the Buyer entitling Sellers to terminate the contract and retain the Earnest Money.

Sellers argue that Purchasers, who were not granted summary judgment, did not allege that the sale would have closed if Sellers presented an executed deed. Purchaser need not do so given our standard of review where we review the record in the light most favorable to Purchaser and where Sellers had to establish specific performance was not appropriate because Sellers fully performed under the contract. See *Koster*, 282 S.W.3d at 846; *Daniels*, 611 S.W.3d at 806; *Four Seasons Lakesites,* 317 S.W.3d at 200.

Purchaser's second point is granted.

**Point III**

Purchaser's petition stated two separate claims. Count I was for Breach of Contract – Specific Performance. Count II was for Breach of Contract – Damages. Purchaser claims in the third point on appeal that the trial court erred in granting summary judgment in favor of Seller with respect to Count II of the petition.

13

The contract has a paragraph that governs default and remedies which states, in pertinent part: "If Seller [Defendants] defaults, Purchaser [Plaintiff] may (a) specifically enforce the Contract or (b) terminate the Contract by written notice to Seller, received [sic] return of Earnest Money and, at Purchaser's option, pursue any remedy and damages available at law or in equity." All parties agree that Purchaser has not provided written notice to Sellers to terminate the contract.

"Where a trial court awards a decree of specific performance to a purchaser of land, inevitably a period of time elapses between the date when the land should have been conveyed in fulfillment of the contract and the date of the decree ordering the performance." *Smith v. Najafi*, 584 S.W.3d 389, 394 (Mo. App. W.D. 2019) (internal quotation marks omitted). "As incident to its decree, the trial court has the discretion to relate performance to the original date of the agreement through an additional award of any costs caused by the delay." *Id*. (internal quotation marks omitted). "This award does not arise as legal damages from the breach of the contract; rather, it is more in the nature of an equitable accounting between the parties in affirmance of the contract." *Id*. (internal quotation marks omitted). "This includes compensating a non-breaching buyer for the increase in interest rates in addition to granting specific performance." *Id*. (internal quotation marks omitted).

Sellers argue that, because Purchaser had not provided written notice to terminate the contract, Purchaser is contractually prohibited from bringing a cause of action as set forth in Count II for damages. Purchaser responds that, even though Count II is explicitly labeled as a count for damages resulting from breach of contract, it is actually a count seeking damages incidental to specific performance.

With respect to Count I (for specific performance), Purchaser seeks:

14

> WHEREFORE, Plaintiff prays the Court enter judgment in its favor, against Defendants, and for entry of an order: (i) awarding specific performance of the Contract; (ii) directing Defendant to deliver an executed Deed, in favor of Plaintiff, to the Title Company and to otherwise fully participate in the Closing in accordance with the Contract; and (iii) *for an award of Plaintiff's costs, attorneys' fees, and other legal expenses incurred herein, and for such other and further relief as this Court deems just, equitable, and proper.*

(Emphasis added). With respect to Count II (for damages), Purchaser seeks:

> WHEREFORE, Plaintiff prays the Court enter judgment in its favor, against Defendants, for damages in excess of $75,000 or such other amount as may be proved at trial, for Plaintiff's attorneys' fees and other legal expenses incurred in connection with Defendants' breach, for prejudgment and post-judgment interest, for costs, and for such other and further relief as this Court deems just, equitable, and proper.

Damages incidental to specific performance are included in Count I which seeks specific performance. Purchaser's second count is barred by the contract at issue in this case.

The point is denied.

### Conclusion

The grant of summary judgment in the defendant Sellers' favor is affirmed with respect to Count II (breach of contract – damages). It is reversed and remanded with respect to Count I (breach of contract – specific performance) for further proceedings consistent with this opinion.

_____
Anthony Rex Gabbert, Judge

All concur.

15